**UNITED STATES of America; the State of New York; and Robert F. Flacke, Commissioner of the Environmental Conservation of the State of New York, Plaintiffs,**

v.

**The CITY OF NIAGARA FALLS, Defendant,**

and

**The Industrial Liaison Committee of the Niagara Falls Area Chamber of Commerce, Defendant–Intervenor.**

No. CIV–81–363C.

United States District Court, W.D. New York.

Dec. 7, 1987.

U.S. Dept. of Justice, Environmental Enforcement Section (Ronald Gluck, Sr. Atty., of counsel), Washington, D.C., for U.S.

Robert Abrams, Atty. Gen. of the State of N.Y. (Joel F. Spitzer, Asst. Atty. Gen., of counsel), Albany, N.Y., for State of N.Y.

Berle, Kass & Case (Michael B. Gerrard, of counsel), Niagara Falls, N.Y., and Carl E. Mooradian, Corp. Counsel of the City of Niagara Falls, Niagara Falls, N.Y., for City of Niagara Falls.

Whiteman, Osterman & Hanna (John Hanna, Jr., and Philip H. Dixon, of counsel), Albany, N.Y., for defendant-intervenor Indus. Liaison Committee.

CURTIN, Chief Judge.

On June 10, 1987, this court approved a schedule proposed by the parties for the resolution of the dispute arising from the discharge of various chemicals from the Falls Street Tunnel in Niagara Falls, New York, into the Niagara River (Item 118); *see also* Item 130 (amending the June 10, 1987, schedule). Plaintiffs United States of America [United States] and the State of New York [the State] now argue that the defendant City of Niagara Falls [the City] is under a legal obligation to prevent these flows pursuant to the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, and its 1975 National Pollutant Discharge Elimination System permit [NPDES permit]. Plaintiffs say that because the City is presently in violation of its obligations, it is entitled to summary judgment. Defendant City and defendant-intervenor Industrial Liaison Committee of the Niagara Falls Area Chamber of Commerce [ILC] oppose.

The factual and procedural history of this case can be briefly summarized as follows. During the 1970s, it was determined that the Niagara Falls Wastewater Treatment Plant [WWTP] was discharging an unacceptably high amount of toxic pollutants into the Niagara River. Pursuant to the terms of the City's 1975 NPDES permit, additional construction was required at the WWTP in order to make the plant capable of accomplishing chemical-physical treatment followed by carbon adsorption by December 31, 1976. Although this construction was actually not completed until 1978 and at considerable expense, the new carbon treatment system still failed to function properly. As a result, plaintiffs filed the instant lawsuit, alleging violations of the Clean Water Act and the City's 1975 NPDES permit.

Subsequently, on January 19, 1984, the parties filed a proposed consent decree with the court [1984 Consent Decree] which required reconstruction of the WWTP's faculty carbon adsorption system and the completion of other related projects to eliminate the unlawful discharge or diversion of untreated wastewater into the Niagara River (Item 16). That same day, this court issued an Interim Order requiring that all parties to comply with this decree until further notice (Item 15). The Interim Order remains in effect to date.

As the United States outlines in its original papers on the question of the Falls Street Tunnel discharge (Item 97), the 1984 Consent Decree set deadlines for the completion of various phases of the construction. More specifically, plaintiffs required the City 1) to complete reconstruction of the 22 carbon bed adsorption system by March 1, 1985, and to commence operation two weeks later; 2) to complete construction and begin operation of the carbon regeneration system by July 27, 1984; and 3) to certify by January 31, 1986, that the WWTP had met all effluent limitations since July 31, 1985, and that the WWTP is capable of complying with all design plans and specifications as well as the City's 1982 State Pollutant Discharge Elimination System permit [1982 SPDES permit]. In addition, the parties agreed that:

> [f]or the first year of actual operation of the revised plant after July 31, 1985, the regeneration furnace shall be operated according to a schedule sufficient to insure that all of the carbon is regenerated at least twice and that no less than 22 contactors are on-line and operating at all times, and whenever possible, 24 contactors shall be so operated.

Item 16, ¶ VIII A. For present purposes, this shall be referred to as the "One–Year Test."

As an initial measure, the parties also agreed that the flows to the then-overloaded WWTP should be reduced by completion of the Falls Street Tunnel Conversion Project by March 1, 1985. *See* 1984 Consent Decree, ¶ XI.A.1. The parties also agreed that the City would eliminate all known dry weather overflow discharges by January 1, 1985, except those from the Gorge Pump Station which would be eliminated by March 1, 1985. The United States says that these measures were agreed to allow

> the carbon adsorption system at the WWTP to operate within its hydraulic loading treatment capacity after rehabilitation in accordance with its original design specifications of 48 mgd [million gallons per day] on a dry weather basis, and to maximize the pollutant removal capacity of the plant by treating more concentrated wastewaters up to the plant's hydraulic capacity.

Item 97, p. 7.

Upon stipulation of the parties, this court entered an order on or about July 9, 1985 [July 1985 Order], which effectively modified the 1984 Consent Decree (Item 42). At the request of the City and upon its representation that the flow of wastewater into the WWTP was as low as 32 mgd in dry weather, this order allowed the City some flexibility regarding the number of carbon beds that must be operating at a given time depending on the flow into the plant. In return for this flexibility, the City agreed, *inter alia*, to abide by the final effluent limitations and monitoring requirements of 1985 SPDES permit (*see* Item 96, Exh. B), and to have all 22 carbon beds available for on-line operation at all times. Plaintiffs also note that the City agreed to operate the plant to maximize the removal of pollutants. *See* July 1985 Order, ¶ 3.D.

As was stated above, the 1984 Consent Decree required construction of the Falls Street Tunnel Conversion Project by March, 1985. *See* Paragraph XI.A.1; *see also* Item 96, Exh. C–3 ("Report on Completion of Facilities Plan Flow Reduction 1981" by Camp, Dresser and McKee [1981 CDM Report], pp. II–13–25). The purpose of this project was to remove all known connections of industrial, commercial, and sanitary wastewater into the Tunnel, and to permit the Tunnel to carry only groundwater. It was believed at the time that this groundwater carried approximately 17 pounds per day of toxic pollutants during dry weather. During wet weather, it was understood that the Tunnel would also carry excess stormwater as well as commercial, industrial, and extraneous overflows that were beyond the hydraulic treatment capacity of the WWTP.

As plaintiffs point out in their papers, it was originally agreed that the Falls Street Tunnel Conversion Project would include the use of "control gates" at the junction of the upper' end of the Gorge Interceptor (1981 CDM Report, pp. II–9) in order to

control the flow from the Falls Street Tunnel to both the Niagara River and the Gorge Interceptor, the latter of which channels wastewater to the Gorge Pump Station and, ultimately, the WWTP. Plaintiffs acknowledge that these gates would normally be remained closed to permit the discharge of groundwater directly into the Niagara River. However, plaintiffs say that it was understood by all parties that if treatment of stormwater and wastewater overflows was required in the future, the control gates could be opened. 1981 CDM Report, II–23.

Plaintiffs note that the Falls Street Tunnel Conversion Project was eventually implemented without the use of these control gates. Instead, plaintiffs say that "the function to be served by the control gates was accomplished by the City through the provision of two orifices or apertures in the bulkhead that was constructed to separate the Tunnel and Gorge Interceptor." Item 97, p. 11, *citing* Item 96, Exh. C–4, ¶ 7, p. 3; Exh. C–5, ¶ 17, p. 2. Plaintiffs say that each of the two orifices or apertures is covered by stainless steel plates that could be removed by unfastening the bolts which secure each plate.

Plaintiffs argue that because the City is in violation of the Clean Water Act and its 1975 NPDES permit, it should be directed by this court to remove this plate to allow the flow of Falls Street Tunnel to flow into the Gorge Interceptor for conveyance to the Gorge Pump Station and on to the WWTP. The City and the ILC say that no such violations have occurred here. The plaintiffs have twice threatened to move for injunctive relief to prevent the discharge of Falls Street Tunnel flows since the beginning of 1987, but both times decided on the eve of oral argument to adjourn these motions (Items 107, 118). Pursuant to the most recent schedule agreed upon by all parties to this lawsuit, this court must now first determine the City's legal obligation, if any, to 1) re-divert the Falls Street Tunnel flows back to the WWTP pursuant to the Clean Water Act and its 1975 NPDES permit, or 2) abate the flows. If this court finds a Clean Water Act viola-

tion, then the question of appropriate remedy must be considered (Item 130).

In support of its present motion, the United States says that the City now discharges approximately 13 mgd of untreated dry weather flow from the Falls Street Tunnel directly into the Niagara River and that this contains approximately 64 pounds of volatile organics and 24 pounds of priority pollutant metals. Item 110, Exh. H, Supplemental Declaration of affidavit of Edmund J. Struzeski, Jr. [Struzeski affidavit II], ¶ 9. Moreover, the United States says that the concentration of such priority pollutants in the Falls Street Tunnel is "almost twice" that currently being received for treatment in the WWTP. Struzeski Affidavit II, ¶¶ 10–11. Plaintiffs say that because there is excess available treatment capacity in the WWTP, the City should be required to treat at least 9–10 mgd of the Falls Street Tunnel flow. They argue that the City's failure to do so constitutes a violation of the Clean Water Act and its NPDES permit because it is an unexcused bypass of the WWTP or an unpermitted discharge of pollutants into the navigable waters of the United States from a point source.

The plaintiffs assert that when they entered into the 1984 Consent Decree the WWTP was badly overloaded and failed to operate effectively. In order to facilitate reconstruction of the WWTP's faulty carbon adsorption system and other related projects, the parties agreed that with the completion of the Falls Street Tunnel Conversion Project (removing all known connections of industrial, commercial, and sanitary wastewater into the Falls Street Tunnel), the Falls Street Tunnel flows would be allowed to directly enter the Niagara River without treatment. Plaintiffs say that it was believed that this flow, consisting of groundwater, excess stormwater and overflows from the WWTP, would only include about 17 pounds per day of pollutants during dry weather. Plaintiffs note that the WWTP is presently treating only 32 mgd of a 48 mgd capacity in dry weather. It also says that the Falls Street Tunnel is discharging much more toxic material than was originally predicted.

The United States says that the City does not have a permit which authorizes such a discharge of the Falls Street Tunnel flow into the Niagara River. It says that the 1975 NPDES permit authorizes only eight outlets from which discharges may occur under certain conditions but that none of these includes the Falls Street Tunnel. *See* Item 96, Exh. A [NPDES permit], Section C, pp. 14–15, ¶ C.1; Item 96, Exh. D, affidavit of Brian J. Maas [Mass Affidavit I], ¶¶ 9–10; Item 127, Affidavit of Mark J. Klingenstein; Item 132, Affidavit of Brian J. Maas [Maas Affidavit II]; Item 133. According to the United States, diversion of the Falls Street Tunnel flow-away from the WWTP is only permissible when the hydraulic capacity of the plant is overloaded. It argues that now that the WWTP has been repaired, this is no longer acceptable. Item 96, Exh. E, affidavit of Edmund F. Struzeski [Struzeski Affidavit I], ¶ 7. It contends that the WWTP can accommodate at least 9 mgd of this Falls Street Tunnel flow now.

Given the above, the United States says that the City's refusal to treat 9–10 mgd of the Falls Street Tunnel flow constitutes an "unauthorized bypass" of the WWTP or an unpermitted discharge from a point source in violation of the Clean Water Act. *See especially* 33 U.S.C. § 1311(a). Item 119, attached memorandum, pp. 21–30.

The State bases its own arguments for summary judgment on the same considerations. It argues that following the 1984 Consent Decree, the court entered the July 1985 Order which was intended to solve the problems caused by the New York Court of Appeals' invalidation of the City's SPDES permit and the City's failure to meet several deadlines contained in the 1984 Consent Decree because of reduction of wastewater flows into the WWTP. The State says that because the City is now violating paragraph 3.D of the July 1985 Order, this court should grant plaintiffs' motion for partial summary judgment.

Paragraph 3.D of the 1985 Order states that:

> The City agrees to operate the [WWTP] in such a manner as to maxim-

ize the removal of pollutants as shall be reasonably attainable consistent with sound economic and engineering practice....

The State says that the City is in violation of this portion of the July 1985 Order by not re-diverting at least 9–10 mgd of the Falls Street Tunnel flows back to the WWTP now that the plant can handle these flows. The State says that the language of paragraph 3.D is derived from section F.1 of the 1982 now-invalid SPDES permit which stated:

> F. *Operation and Maintenance of the Combined Sewer Overflows*
> 1. The permittee shall operate the treatment works, including the treatment plant and total sewer system, to minimize the discharge of pollutants listed in the permit from combined sewer overflows or bypasses.

Item 96, Exh. B, p. 16. The State also argues that the SPDES permit provided effluent limits only for pollutants that are discharged from the WWTP, but not from other point sources such as the Falls Street Tunnel. However, the State says:

> this is not unrestricted permission to discharge pollutants at such other points.... [U]nder the terms of 3.D. which was derived from F.1., the City must put the FST flow into its WWTP when it will result in the treatment of the most pollutants.

Item 113, pp. 7–8. Given the above, the State says that the City's refusal to treat or abate the Falls Street Tunnel constitutes a violation of the Clean Water Act and its 1975 NPDES permit.

The City and the ILC oppose both plaintiffs' motions. These parties submit that the Falls Street Tunnel discharge is, contrary to plaintiffs' position, lawful because:

> the flow is *mandated* by the Clean Water Act itself, *allowed* by the NPDES permit; *allowed* by the subsequent State Pollutant Discharge Elimination System ("SPDES") permit; and *mandated* by the consent decrees in this litigation.

Item 122, p. 6 (emphasis in original). Defendants say that the mere fact that the amount of chemicals now entering the Ni-

agara River by way of the Falls Street Tunnel is greater than expected does not, in itself, mean that the City is in violation of the Clean Water Act. More specifically, the defendants point to 33 U.S.C. §§ 1281(g)(3), 1292(2)(C) (concerning "Grants for Construction of Treatment Works") as evidence that the City has fully complied with the applicable law.

According to defendants, the primary mechanism for ensuring that excessive infiltration/inflow [I/I] is removed is through facilities planning. 40 C.F.R. § 35.917–1(c), (d). The City says that following inquiry by EPA about the I/I question in 1979, it commissioned an I/I analysis and asked Camp, Dresser & McKee to perform a flow reduction study. *See* Item 123, Exh. D. Based on the results of these studies, it was determined that the Falls Street Tunnel was a major source of I/I which had to be diverted away from the WWTP. Thereafter, the defendants state that United States issued two documents (*id.*, Exhs. E and F), which recommended that the Falls Street Tunnel Conversion Project be undertaken to allow the tunnel to carry only groundwater infiltration and storm runoff. The City notes that while one of these documents acknowledged that some "offending chemicals could result from groundwater infiltration," it suggested that "this problem may best be addressed through remedies designed to isolate and abate such sources of groundwater contamination." *Id.*, Exh. E, pp. 3–4. The City summarizes:

> The purpose of diverting [Falls Street Tunnel] flows away from the WWTP and toward the River was to comply with the provisions of the Clean Water Act and the EPA regulations in removing excess I/I, thereby allowing the WWTP to function more effectively. The City, all agree, carried out this requirement and

diverted the [Falls Street Tunnel] flows in 1985. It is this work which EPA and DEC now seek to undo.

Item 122, p. 11. According to defendants, because the Falls Street Tunnel flow consists of only excess infiltration, which the Clean Water Act had long required to be diverted away from treatment plants, and stormwater, which Congress now says may not be regulated until 1992 (section 405 of the Water Quality Act of 1987, Pub.L. 100–4, 101 Stat. 7) (February 4, 1987), there is no legal basis under the Clean Water Act for requiring the Falls Street Tunnel flows to be taken back into the WWTP.

Moreover, defendants say that the Falls Street Tunnel discharge is allowed by the NPDES permit. It notes that "Outfall 001" is permitted and "appears to encompass the WWTP discharge and the nearby [Falls Street Tunnel] discharge." Item 122, p. 13. In addition, defendants say that the "rationale" for the NPDES permit authorizes the Falls Street Tunnel discharge because that permit required the I/I study which ultimately led to the diversion of the Falls Street Tunnel flows away from the WWTP.[1] *See* Item 129, August 5, 1987, Affidavit of John R. Westerdorf [Westerdorf Affidavit I]; Item 135, October 6, 1987, Affidavit of John R. Westerdorf [Westerdorf Affidavit II]. Finally, defendants say that the Falls Street Discharge is allowed by the 1982 SPDES permit and mandated by the 1984 Consent Decree and the July 1985 Order in this case.

The ILC makes essentially the same arguments in its papers (Items 124 and 125). Importantly, the ILC makes explicit the defendants' view that the "Clean Water Act does not provide that contaminants in such non-wastewater discharges [like the Falls Street Tunnel] can be forever ignored" but that "the matter be addressed

---

1. Defendants argue that page 3, paragraph 8, of the NPDES permit allows "diversion or bypass of any discharge from the treatment works … where excessive storm drainage or runoff would damage any facilities necessary for compliance with the terms and conditions of this permit." Plaintiffs say that the Falls Street Tunnel Conversion Project was undertaken precisely because the I/I "damaged" the WWTP's ability to treat industrial wastes. The defendants also note that the NPDES permit was written years before the I/I study, the Falls Street Tunnel Conversion Project, and other decrees and court orders. Therefore, they say it is irrational to suppose that this 1975 document would include explicit mention of the Falls Street Tunnel discharge.

in a coherent fashion." Item 124, pp. 11–12. It proposes that the parties first determine 1) the seriousness of the problem, 2) the source of these contaminants, and 3) the potential solutions that may exist before a remedy is devised. The ILC says that the Water Quality Act of 1987, § 405 makes clear that the Falls Street Tunnel Discharge problem should be addressed through the permitting process after the appropriate studies are completed. *See also* Item 134.[2]

I believe that the City is in violation of its legal obligation under the Clean Water Act and its 1975 NPDES permit by allowing the untreated Falls Street Tunnel flows to enter the Niagara River. As such, plaintiffs' present motions for partial summary judgment on this issue are granted.

Contrary to defendants' view, I find that the evidence in this case shows that the City's 1975 NPDES permit did not authorize the discharge of pollutants from the Falls Street Tunnel during dry weather. While the parties disagree about whether or not discharge point 001 of the 1975 NPDES permit was intended to include the Falls Street Tunnel, it is clear that discharges from point 001 were only allowed as regulator overflow discharges from the City's combined sewer system during periods of wet weather "[w]hen interceptor capacity is exceeded resulting in discharge of excess flow from regulator to outlet to river" (Item 132, Exh. 2, p. II–2A), as well as an outlet for the WWTP when it became operational (*id.*, Exh. 6, p. 2). *See also* Maas Affidavit II, ¶¶ 27–33. Therefore,

dry weather flows coming from the Falls Street Tunnel constitute a violation of the Clean Water Act and the City's 1975 NPDES permit for which plaintiffs are now entitled to relief. *See also* Item 33, pp. 1–3.

While the United States and the State agreed in 1984 to allow a limited discharge of pollutants from the Falls Street Tunnel following the completion of the Falls Street Tunnel Conversion Project, it is clear that this measure was agreed to as part of a plan to allow the WWTP to operate within its hydraulic capacity. At this same time, it was understood that the Falls Street Tunnel flows could be ordered re-diverted back to the WWTP in the future if such return would maximize pollutant removal. *E.g.*, 1981 CDM Report, II–23.

As I noted above, it was subsequently found that as a result of reduced flows in the WWTP, the WWTP had substantial excess treatment capacity which was not being effectively utilized. In addition, all parties concede that it was discovered that the discharge of untreated priority pollutants from the Falls Street Tunnel was much higher than anticipated. As a result, plaintiffs began to press for a determination by this court that the City was in violation of the Clean Water Act and its 1975 NPDES permit.

I find that the City is in violation of federal law and its 1975 NPDES permit by allowing the untreated dry-weather discharge to enter the Niagara River by way of the Falls Street Tunnel. 33 U.S.C. §§ 1251, 1311. Contrary to defendants' po-

---

**2.** On July 24, 1987, plaintiff United States filed a reply brief in support of its summary judgment motion (Item 126). It claims that the requirements for construction grant assistance under the Clean Water Act are, contrary to defendants' view, inapplicable to the issues before the court because the City is not now applying for federal financial assistance for construction of facilities to treat the Falls Street Tunnel flows and the plaintiffs will not provide such assistance now. *Cf.*, Item 129, attached affidavit of Nicholas E. Marchelos.

The United States also contends that the Falls Street Tunnel discharge is not authorized by the now-invalid 1982 SPDES permit. It argues that the "entire SPDES permit is not revived by the Consent Decree and/or its subsequent modifica-

tions." Item 126, p. 16. Instead, it argues that plaintiffs did not order the Falls Street Tunnel flow to the Niagara River but allowed such diversion with the understanding that "future rediversion ... was also contemplated ... as necessary." *Id.* at 18. 1981 CDM Report, II–23. The United States says that the 1984 Consent Decree was not intended to be a permit under the Clean Water Act but was only intended to "supplement the requirements of the Clean Water Act." Item 126, pp. 20–21. Moreover, the United States says that the July 1985 Order was only intended to modify and clarify specific portions of the 1984 Consent Decree and to revive those portions of the invalidated 1982 SPDES permit dealing with the applicable effluent limitations and monitoring requirements.

sition, the City's obligation under the Clean Water Act is not altered for purposes of this determination by the statutory language contained in sections 1281(g)(3), 1292(2)(C), the Water Quality Act of 1987, the now invalid 1982 SPDES permit, the 1984 Consent Decree, or the 1985 Order.

While it is true that the plaintiffs did excuse the defendants from strict compliance with the 1975 NPDES permit during the time in which the WWTP was under reconstruction, I find that the language and spirit of the Clean Water Act requires re-diversion or abatement of the Falls Street Tunnel flows now that treatment capacity is available in the WWTP and pollutant flows into the Niagara River have been found to be excessive. Absent a sufficient showing by the defendants that such re-diversion or abatement cannot be reasonably effectuated "consistent with sound economic or engineering practice," defendants must remedy these unpermitted flows. July 1985 Order, § 3.D.

In summary, plaintiffs' motions for partial summary judgment under the Clean Water Act are granted. During the next few days, I will set a date for the parties to meet with the court to discuss the next steps to be taken in this litigation.

So ordered.