UNITED STATES of America, The State of New York, and Thomas C. Jorling, Commissioner of the Department of Environmental Conservation of the State of New York, Plaintiffs,

v.

The CITY OF NIAGARA FALLS, Defendant,

The Industrial Liaison Committee of the Niagara Falls Area Chamber of Commerce, Defendant–Intervenor.

No. CIV–81–363C.

United States District Court, W.D. New York.

March 1, 1989.

United States Dept. of Justice (Barbara A. Finamore, Alan Morrissey, and George Shanahan, of counsel), Washington, D.C., for United States of America.

Robert Abrams, Atty. Gen. of the State of N.Y. (Joel F. Spitzer, Asst. New York State Atty. Gen., Environmental Protection Bureau, of counsel), Albany, N.Y., for plaintiff State of N.Y.

Berle, Kass & Case (Michael B. Gerrard, of counsel), New York City and Carl E. Mooradian, Corp. Counsel of the City of Niagara Falls, for defendant City of Niagara Falls.

Whiteman, Osterman & Hanna (John Hanna, Jr., and Philip H. Dixon, of counsel), Albany, N.Y., for defendant-intervenor Industrial Liaison Committee.

CURTIN, District Judge.

By order dated December 7, 1987, this court granted plaintiffs' motion for partial summary judgment finding that the discharge of untreated dry weather flows from the Falls Street Tunnel [FST] into the Niagara River constituted a violation by defendant of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and its 1975 National Pollutant Discharge Elimination System [NPDES] permit, and ordered defendant to remedy that violation by abating the flow or re-diverting it through the Niagara Falls Wastewater Treatment Plant [WWTP] unless defendant could sufficiently demonstrate to the court that any such remedy could not be reasonably undertaken "consistent with sound economic or engineering practice." *United States v. City of Niagara Falls*, 674 F.Supp. 1013, 1020 (W.D.N.Y. 1987) (Item 142). In order to fully and

properly consider the question of the appropriate remedy, the court held an evidentiary hearing during the period of July 11–29, 1988, encompassing 11 days of testimony from 9 witnesses, and heard additional testimony and summations on September 23, 1988. At the conclusion of the hearing, the court noted that the parties were close to agreement on several crucial matters, and suggested the continuation of settlement discussions in order to attempt to reach an informal resolution of the remedy issue. The parties have now informed the court that those discussions have failed to produce an agreement as to the appropriate scope of the remedy (*see* Item 215), and the matter has thus been submitted to the court for decision. The following constitutes the court's findings of fact and conclusions of law made on the basis of the entire record before the court, including the evidence adduced at the July and September, 1988, hearing.

*Background*

The factual and procedural history of this case can be briefly summarized as follows. Defendant City of Niagara Falls [City] owns and operates a municipal sewerage system consisting of the WWTP and a related ancillary wastewater and stormwater collection system, which includes the FST. Item 210, ¶ 1. The FST is a large, rock-hewn tunnel under the streets of Niagara Falls, New York, that for many years collected sewage, industrial waste, stormwater and groundwater and sent the combined flow to the WWTP for treatment prior to discharge into the Niagara River. *Id.*, ¶ 2. In the late 1950s and early 1960s, the Power Authority of the State of New York [PASNY] severed the FST to construct conduits for the Niagara Power Project, and then reconstructed the FST in its original location, using reinforced concrete pipe and gasketing material. Item 194 (Tr.), pp. 80–81. The PASNY conduits run under, and perpendicular to, the FST. *Id.*, pp. 84–87.

During the early 1970s, it became evident that the WWTP was discharging an unacceptably high amount of toxic pollutants into the river. On January 9, 1974, pursuant to Section 402(a) of the Clean Water Act, 33 U.S.C. § 1342(a), the Regional Administrator of the Environmental Protection Agency [EPA] issued defendant NPDES Permit No. NY0026336, effective January 30, 1975, which established the terms and conditions under which the City may discharge pollutants.[1] Exh. A, attached to Item 97. Pursuant to that permit, a new system was constructed at the WWTP to allow for chemical-physical treatment of sewage, followed by carbon adsorption. Completed in early 1978 at an approximate cost of $61 million (75% of which was derived from federal grants, and 12.5% from state grants), the carbon treatment system failed in July, 1978. Item 98, pp. 3–4. Plaintiffs subsequently filed this action on May 6, 1981, for injunctive relief pursuant to the Clean Water Act, asserting several violations of the NPDES permit as a result of the discharge of inadequately treated industrial, commercial, and human wastes into the river. Item 1. By order dated September 27, 1984, the court granted the motion of the Industrial Liaison Committee of the Niagara Falls Area Chamber of Commerce [ILC] to intervene as a defendant. Item 36.

1. Subsequent to the issuance of the NPDES permit, New York State was delegated primary responsibility under the Clean Water Act for management of the NPDES permit program in New York State. *See* 33 U.S.C. § 1342(b); *see also* New York Environmental Conservation Law § 17–0801, and 6 NYCRR 751.1(c). On October 5, 1982, the State issued a State Pollutant Discharge Elimination System [SPDES] permit, effective November 1, 1982 (Exh. B, attached to Item 97), which set somewhat more stringent effluent limits and monitoring requirements than the NPDES permit, and which was subsequently invalidated by the New York Supreme Court on the grounds that the State had failed to hold a public hearing as required under state law. *In the Matter of Industrial Liaison Committee of the Niagara Falls Chamber of Commerce v. Flacke*, No. 4632–84 (Sup.Ct. October 2, 1984), *aff'd* 108 A.D.2d 1095, 485 N.Y.S.2d 662 (3d Dept.1985). As a result of this invalidation, the 1975 NPDES permit regained its former status as the permit under which defendant can lawfully discharge pollutants into the river. By order dated July 9, 1985, entered upon stipulation of the parties, defendant agreed to abide by the more stringent limitations and requirements of the SPDES permit. Item 42.

On January 19, 1984, the parties filed a proposed Consent Decree with the court, and by order dated that same day, the court ordered the parties to comply with the terms of that decree. Items 15, 16. The Consent Decree required, among other things, the reconstruction of the WWTP's faulty carbon adsorption system, and adopted measures to reduce flows to the WWTP while that reconstruction took place. The cornerstone of the flow reduction program was the Falls Street Tunnel Conversion Project.[2] *See* Item 16, ¶ XI.A.1. The purpose of the Conversion Project was to allow the FST to function as a combined sewer overflow conduit by disconnecting it from the rest of the sewage treatment system, resulting in the direct discharge into the river of untreated dry weather groundwater flows and storm overflows of diluted waste water. It was understood at the time the parties filed their Consent Decree "that the [FST] flows could be ordered re-diverted back to the WWTP in the future if such return would maximize pollutant removal." 674 F.Supp. at 1019 (citing Camp, Dresser & McKee Report, attached as Exh. C–3 to Item 97). The Conversion Project was envisioned by the City as a means of enabling the treatment of more concentrated waste flows while at the same time alleviating the burden on the pumps at the Gorge Pump Station [GPS], which pump wastewater from the northern sections of the City southward to the WWTP. As contemplated, this was to be accomplished by installing control gates at the junction of the FST and the upper end of the Southside Gorge Interceptor [SGI] (which channels the FST flow to the GPS and, ultimately, to the WWTP) so as to provide greater control of the flow to either the river or the WWTP. When the plan was implemented in May, 1985, however, the City constructed a "bulkhead" to separate the FST and the SGI, and provid-

ed two "apertures" in the bulkhead, each of which was covered by an easily removable stainless steel plate secured by four bolts. *See* 674 F.Supp. at 1015–16; *see also* Item 194 (Transcript of July, 1988 hearing [Tr.]), pp. 60–64; Item 98, pp. 3–12.

It was believed by the parties at the time the Consent Decree was filed that the dry weather groundwater FST flow would carry approximately 17 pounds per day [ppd] of organic priority toxic pollutants. 674 F.Supp. at 1015; Item 194 (Tr.), p. 66. As of December, 1987, however, it had been determined that the FST dry weather flow, averaging about 11.5 million gallons per day [mgd], contained "much more toxic material than was originally predicted," 674 F.Supp. at 1016, and sampling at Shaft 0 (the last shaft accessible to the FST before it drops down the Niagara Gorge and discharges its flow into the river) conducted between June, 1985 and March, 1988 has indicated that anywhere from 30–78 ppd of toxic pollutants are being discharged directly into the river on a daily basis during dry weather.[3] Item 194 (Tr.), pp. 77, 88–89, 1661–63; Exh. E (Affidavit of Edmund J. Struzeski), attached to Item 97.

This court's December 7, 1987, order found that since these pollutant levels were much higher than expected, and since the WWTP, after repair of the carbon treatment system, "had substantial excess treatment capacity which was not being effectively utilized",[4] 674 F.Supp. 1019, the untreated dry-weather FST flow violated the Clean Water Act and the City's NYPDES/SPDES discharge permit. *Id.* The court ordered the City to remedy those violations, or to make a sufficient showing why re-diversion or abatement of the FST flow "cannot be reasonably effectuated 'consistent with sound economic or engineering practice'". *Id.* at 1020. The case

---

2. The project was adopted on the recommendation of the "Report on Completion of Facilities Plan Flow Reduction 1981" by Camp, Dresser & McKee. *See* Exh. C–3, attached to Item 97.

3. Wet weather estimates indicate discharge levels of up to 200 ppd of toxic priority pollutants. Exh. E, attached to Item 97.

4. The WWTP currently is capable of functioning at a full capacity of 48 mgd on a long-term basis, and 60–65 mgd on a short-term basis, and was designed to handle a peak hydraulic capacity of 85 mgd. Item 193, ¶ 14. The WWTP is currently handling an average dry-weather flow of approximately 32 mgd. *Id.,* ¶ 15.

is before the court at this procedural juncture on plaintiff's motion for a permanent injunction ordering defendant to comply with the December 7, 1987, order.

*Arguments*

The parties' arguments can be briefly summarized as follows. In support of their request for permanent injunctive relief, plaintiffs contend that the court's jurisdiction is limited by the Clean Water Act and interpretive caselaw to fashioning an injunctive remedy that will ensure prompt compliance with the Act and with the NYPDES/SPDES permit. According to plaintiffs, the only such remedy would be re-diversion of the FST flow, either in whole or in part, back through the WWTP for treatment. Item 171, pp. 3, 10. Plaintiffs contend that since the flow is an unauthorized "diversion or bypass of [a] discharge[ ] from the treatment works" under the terms of the NPDES/SPDES permit (Exh. A, § A.8, attached to Item 97), as well as a "discharge of a pollutant" in violation of the Clean Water Act (*see* 33 U.S.C. § 1362(12), (16); *see also* 40 C.F.R. § 122.2), and since the court has already determined that the City must remedy that violation, the proper focus for the court at this juncture is whether the City has demonstrated any engineering or economic reasons which would warrant further delay in ordering re-diversion. Plaintiffs argue that the City has failed to make such a showing, and thus has not shown why the currently available capacity of the WWTP should not now be utilized to treat the FST flow. Plaintiffs also contend that no further showing of environmental harm is necessary to warrant the court's framing appropriate injunctive relief to order the flow's immediate re-diversion. *Id.*, pp. 22–30.

The City responds that there are important engineering and economic reasons for not taking back the FST flow at this time. According to the City, re-diverting 11.5 mgd back through the WWTP, without significant and costly modifications to the GPS pumps, would result in an excess in the capacity of the GPS and may cause shaft failure or other damage to the sewer system. Item 202 (Tr.), pp. 979–95, 998–1001, 1005–07, 1161–62; Item 212, pp. 9–12. The City further argues that re-diversion would cause an adverse impact on sewer rates for both significant industrial users [SIUs] and commercial, small industrial, and residential users [CSIRUs] which would result in the discouragement of new customers or loss of current ones. Item 199 (Tr.), pp. 558–63.

With regard to the issue of water quality, the City argues that the total pollutant loadings to the river from the FST, when added to the total loadings from the WWTP, are less than the NPDES/SPDES limits (with the exception of dichlorobenzenes, which the City contends will be adequately dealt with by the remediation efforts of the Frontier Chemical Co. and by the guidelines to be set forth in the new SPDES permit). Item 194 (Tr.), pp. 105–108, Item 195 (Tr.), pp. 126–128. The City further contends that as much as one-half of the volatile chemicals present in the FST "volatilize"[5] into the air after detection at Shaft 0 but before reaching the river, and thus the total loading of organic compounds would closely approach the 17 ppd estimate originally contemplated, and agreed upon as acceptable, by the parties. Item 194 (Tr.), pp. 98–99; 103.

The City's argument for an alternative remedy centers around its contention that a significant portion of the contaminated groundwater flow would be eliminated by a repair of the FST at the point at which it crosses over the PASNY conduits. According to the City, the Falls Street Tunnel Study [FST Study] undertaken pursuant to the March, 1987, Addendum to the Consent Decree (Item 94) revealed that several cracks and leaks had developed in the concrete pipes and gaskets where the FST had

---

5. "Volatilization" is the process by which chemicals are removed from the water and emitted into the air, such as occurs when the FST flow tumbles down the gorge to the discharge outlet. Item 194 (Tr.), pp. 95–99. The City contends that such a phenomenon does not affect the air quality so as to pose a health threat to anyone breathing the air in the vicinity of the FST discharge point. Item 201 (Tr.), pp. 780–91.

been severed and reconstructed by PAS-NY, accounting for approximately 70–80% of the entire FST flow entering the river. Item 194 (Tr.), p. 83; Item 198 (Tr.), pp. 495–97, 498, 507–08, 510–14. Thus, the City contends that repair of the FST at the PASNY crossing would be the most prudent remedy under the circumstances presented here since such repair would result in the elimination of 8.8 mgd of the total 11.5 mgd FST flow. Item 212, p. 19.

Plaintiffs respond to these arguments by pointing out that, while repairs at the PAS-NY crossing may indeed eliminate up to 80% of the dry-weather groundwater flows into the tunnel, the City's own estimates show that those repairs will eliminate only 13 ppd of pollutants. Item 195 (Tr.), pp. 283–84. Plaintiffs further argue that the City's concerns about the capacity of the GPS and of the gravity sewer system should re-diversion be ordered are contradicted by the testimony of its own expert indicating that the GPS, now pumping between 5.5 mgd and 9.5 mgd to the WWTP, is currently capable of pumping 20.6 mgd to the WWTP without any engineering difficulty (Item 202 (Tr.), pp. 976; Item 203 (Tr.), pp. 1065–66, 1082, 1162, 1187) or damage to the gravity system (Item 203 (Tr.), p. 1066), and thus rediversion of the entire 11.5 mgd FST flow would, based on the City's highest estimate of a short-term 9.5 mgd flow, result in a maximum 400,000 gallon per day overflow which would in any event bypass the GPS, and be discharged directly into the river, by means of an overflow weir designed for that purpose. Item 202 (Tr.), pp. 977–78; Item 203 (Tr.), pp. 1076–77. According to plaintiffs, it follows from this that any excess "first flush" stormwater flow would also overflow into the weir and then into the river before reaching the GPS pumps, and thus the sewer system would rarely, if ever, be tested beyond its 20.6 mgd capacity. Item 203 (Tr.), pp. 1081–82. Plaintiffs maintain that the City has already completed routine maintenance work and minor modifications at the GPS which would allow for the pumping of up to 11 mgd on a short-term basis—*i.e.*, during the time it would take to repair the FST at the PASNY crossing, and

that the major system modifications proposed by the City are therefore unnecessary before the court orders re-diversion of the FST flow. Item 210, ¶¶ 66–73; Item 203 (Tr.), pp. 1103–06.

With regard to the issue of water quality, plaintiffs contend that it is unnecessary for the court to determine the exact amount of toxic chemicals entering the river from the FST since the Clean Water Act imposes strict liability on a discharger for any violation of the terms and conditions of its NPDES permit. Because the City's 1975 NPDES permit prohibits all untreated discharges, and because the court has no jurisdiction to modify that permit, plaintiffs argue that the court need not reach the highly technical issue of whether a permit violation, such as the court has found to exist here, will have an adverse impact on water quality. Item 210, ¶¶ 16, 25. Plaintiffs further contend that, should the court reach the water quality issue, the evidence is nonetheless convincing that the FST is discharging a substantial amount of toxic chemicals which have an adverse impact on the water quality of the river. *Id.* According to plaintiffs, the evidence shows that between December, 1985 and March, 1988, the FST has been discharging between approximately 65–80 ppd (or 10–12 tons per year) of toxic priority pollutants (Item 208 (Tr.), pp. 1627–28, 1636–37, 1654), and that water samples taken from the river downstream from the FST show that water quality standards have been exceeded for a number of pollutants, including such known carcinogens as polychlorinated biphenyls (PCBs) and tetrachloroethylene (20–25% of which plaintiff contends are attributable to the FST flow). Item 201 (Tr.), pp. 848–51, 872–73, 925; Item 206 (Tr.), pp. 1445–53; Item 208 (Tr.), pp. 1586–87, 1591.

Finally, the ILC contends that the court's discretion in fashioning injunctive relief in this case is not, as plaintiffs argue, limited by the Clean Water Act to ordering immediate re-diversion of all or part of the FST flow to the WWTP. According to the ILC, traditional principles of equity jurisdiction apply with full force to cases under the Clean Water Act, and thus the court should

be allowed to frame its remedy order to take into full account the substantial and various engineering, economic and environmental considerations brought out during the course of the hearing. Item 211, pp. 3–7. The ILC further contends that plaintiffs should not now be allowed to characterize the FST dry-weather flow as a "prohibited bypass" requiring immediate re-diversion, since this is the same flow of groundwater infiltration and stormwater runoff that had previously been ordered removed from the WWTP as the basis of the Conversion Project. *Id.*, pp. 8–10.

*Discussion*

■ As an initial matter, the parties have presented differing views, outlined above, as to the appropriate scope of the court's discretion in fashioning an injunctive remedy to address a violation of the Clean Water Act. Under that Act, the Administrator of the Environmental Protection Agency [EPA] is authorized to commence a civil action in federal district court "for appropriate relief, including a permanent or temporary injunction...." 33 U.S.C. § 1319(b). The Supreme Court has recognized that, in enacting this section,

> Congress did not anticipate that all discharges would be immediately enjoined. Consistent with this view, the administrative practice has not been to request immediate cessation orders. "Rather, enforcement actions typically result, by consent or otherwise, in a remedial order setting out a detailed schedule of compliance designed to cure the identified violation of the Act."

*Weinberger v. Romero–Barcelo*, 456 U.S. 305, 317–18, 102 S.Ct. 1798, 1805–06, 72 L.Ed.2d 91 (1982) (quoting Brief for Petitioners 17, and citing *Milwaukee v. Illinois*, 451 U.S. 304, 320–22, 101 S.Ct. 1784, 1794–95, 68 L.Ed.2d 114 (1981)). Thus, a request for relief under the Clean Water Act does not

> foreclos[e] completely the exercise of the court's discretion. Rather than requiring a district court to issue an injunction for any and all statutory violations, the [Clean Water Act] permits the district court to order that relief it considers

necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation.

*Romero–Barcelo*, 456 U.S. at 320, 102 S.Ct. at 1807. The *Romero–Barcelo* case involved a suit by residents of a small island off the coast of Puerto Rico to enjoin the Navy's discharge of ordnance into nearby waters during weapons training operations. The district court found that the discharge, done without a NPDES permit, was a violation of the Clean Water Act, and ordered the Navy to apply for a permit. *Id.* at 307–09, 102 S.Ct. at 1800–02. The court, however, on balancing the parties' competing interests, refused to enjoin the Navy's operations during the permit process since the discharge was construed to be a "technical violation" which did not cause "any 'appreciable harm' to the environment," *id.* at 310, 102 S.Ct. at 1802, and an injunction would cause "grievous, and perhaps irreparable harm" not only to the Navy's military preparedness but also to the Nation. *Id.* The First Circuit reversed, finding that traditional equitable principles were inapplicable where there was an absolute statutory duty to comply with NPDES permit requirements, and ordered the Navy to cease its violation until it obtained a permit. 643 F.2d 835 (1st Cir.1981). The Supreme Court reversed. After initially reviewing the well-established principles for awarding equitable relief in federal courts, the Court concluded that the purpose of the Clean Water Act—to restore and maintain the integrity of the Nation's waters—would not be undermined by allowing the statutory violation to continue during the permit application procedure since the discharge was not actually polluting the water. 456 U.S. at 314–15, 102 S.Ct. at 1804–05. The Court found nothing in the language, structure, or legislative history of the Clean Water Act to suggest that Congress intended to deny courts their traditional discretion to rely on equitable remedies other than an immediate prohibitory injunction in enforcing the provisions of the statute, including the provision governing NPDES permits. *Id.* at 314–18, 102 S.Ct. at 1804–06.

In *Amoco Production Co. v. Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), the Supreme Court confirmed the *Romero–Barcelo* approach to injunctive relief under the Clean Water Act. The Ninth Circuit in *Amoco* had enjoined the Secretary of the Interior from allowing oil and gas exploration activities on the Outer Continental Shelf [OCS] because he had failed to properly follow the statutory environmental impact analysis procedures under the Alaska National Interest Lands Conservation Act [ANILCA], 16 U.S.C. § 3120(a). *People of the Village of Gambell v. Hodel,* 774 F.2d 1414 (1985). The court of appeals found this defect in procedure to be "presumed" irreparable harm, mandating injunctive relief, despite the district court's finding that OCS exploration activities would not significantly restrict Alaskan Natives' use of subsistence resources. *Id.* at 1423–25. The Supreme Court reversed, holding that the court of appeals "erroneously focused on the statutory procedure rather than on the underlying substantive policy the process was designed to effect—preservation of subsistence resources." 480 U.S. at 544, 107 S.Ct. at 1403. The Court went on to state that, while the presumption of irreparable injury is contrary to traditional equitable principles, injunctive relief is the favored remedy where sufficient environmental injury is demonstrated.

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Id.* at 545, 107 S.Ct. at 1404.

Thus, in *Romero–Barcelo* and *Amoco,* the Court denied injunctive relief because the "technical" or "procedural" violations of the relevant statute did not violate the law's underlying purposes. Taken together, those cases stand for the proposition that the district court is not mechanically required under the Clean Water Act to issue injunctions for every technical violation, but retains the full measure of its equitable discretion in fashioning appropriate enforcement relief, including the power to deny an injunction where its issuance would not further the substantive policies underlying the Act. *See PIRG of New Jersey v. CP Chemicals Inc.,* 26 Env.Rep. Cases (BNA) 2017, 2021 (D.N.J. November 25, 1987).

■ In the instant case, unlike in *Romero–Barcelo* and *Amoco,* the violation of the Clean Water Act at issue is not "technical" or "procedural" in nature, but rather is a "discharge of pollutants from the [FST] during dry weather," 674 F.Supp. at 1019, in violation of the City's NPDES permit. As such, the discharge is a violation of that part of the Clean Water Act—*i.e.,* the permit requirements of 33 U.S.C. § 1342—fundamental to furthering the Act's major underlying purpose of "establish[ing] a comprehensive long-range policy for the elimination of water pollution," *Romero–Barcelo,* 456 U.S. at 319, 102 S.Ct. at 1807 (quoting S.Rep. No. 92–414, 92d Cong., 2d Sess. 95 (1971), 1972 U.S.Code Cong. & Admin.News 3668), as well as the stated objectives "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), and to "preserv[e] ... the environment and ... protect[ ] ... mankind and wildlife from harmful chemicals." *PIRG of New Jersey v. Top Notch Metal Finishing Co.,* 20 Env.Rep. Cases (BNA) 2012, 2015 (D.N.J. November 6, 1987) [1987 WL 44393]. The untreated FST discharge, therefore, continues not merely in derogation of "the integrity of the permit process" as in *Romero–Barcelo,* 456 U.S. at 314, 102 S.Ct. at 1804, but is a violation which undermines the substantive policies, purposes, and objectives of the Clean Water Act, a violation for which this court has already determined plaintiffs are entitled to relief. 674 F.Supp. at 1019. The instant case is thus one in which injunctive relief, if warranted on balancing the equities, is proper as a means of furthering those policies, purposes and objectives.

As mentioned above, this case is before the court in the posture of a motion for permanent injunction. In deciding whether

a permanent injunction should issue, it must first be determined whether plaintiff has actually succeeded on the merits. If so, the court must then decide whether the balance of equities favors injunctive relief, and if so, what form that relief should take. *Sierra Club v. Alexander*, 484 F.Supp. 455, 471 (N.D.N.Y.), *aff'd*, 633 F.2d 206 (2d Cir.1980). Since the first part of this inquiry—success on the merits—has already been decided in plaintiffs' favor by this court's December 7, 1987, order, the relevant inquiry becomes whether the balance of equities favors the issuance of a permanent injunction in this case. As the discussion above makes clear, the court, in striking that balance, retains the full measure of its traditional equitable discretion to consider whatever evidence adduced at the hearing that may be relevant to fashioning appropriate relief under the Clean Water Act.

In order to more fully comprehend the extent of the hardships claimed by the parties here, the court has considered testimony and exhibits regarding the environmental, engineering, and economic problems relative to any grant or denial of injunctive relief. The essential balance that must be struck is whether the harm to the environment caused by the FST discharge is outweighed by the engineering difficulties which the City would face, and the economic burden which the users of the City's sewer system would bear, should all or part of that discharge be ordered to be re-diverted through the WWTP for treatment.

It is important to note that in considering evidence on environmental harm, the court has not reopened for litigation the issue as to whether the FST dry weather discharge is an unauthorized bypass of the WWTP in violation of the City's NPDES/SPDES permit. That issue was conclusively determined by the court's order of December 7, 1987. Nor has the court allowed such evidence as a basis for setting new NPDES/SPDES effluent limits or otherwise modifying the permit. That, of course, this court cannot do. *See* 33 U.S.C. § 1369(b) (United States Circuit Court of Appeals is exclusive forum for judicial review of EPA Administrator's action); *see also United States v. Ethyl Corp.*, 761 F.2d 1153, 1155 (5th Cir.1985), *cert. denied*, 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986). Moreover, the legislative history of the Clean Water Act makes it clear that Congress intended enforcement proceedings such as the instant one to be relatively simple, straightforward factual inquiries as to whether the requirements of the Act have been complied with.

[T]he bill reported from the Committee establishes and makes precise new requirements imposed on persons and subject to enforcement. One purpose of these new requirements is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements under this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay.

S.Rep. No. 92–414, 92d Cong.2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin. News 3668, 3730; *see Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 451–52 (D.C.Md.1985) ("The discussion in Congress regarding monitoring and enforcement reveals that Congress intended to keep enforcement actions simple and speedy."). The court is guided by that intent no less at the remedy stage of this enforcement action than at the liability stage. The environmental evidence presented during the course of the hearing is thus considered only in the context of plaintiffs' attempt to show harm to the environment should the FST flow be allowed to continue unabated.

Upon review of the entire record, including the hearing evidence, I find that plaintiffs have succeeded in that attempt. The record establishes that the FST dry weather discharge during the sampling period from December, 1985, to June, 1987, averaged approximately 78 ppd (*see* Plaintiffs' Exhs. 6, 7, 8; *see also* Item 208 (Tr.), p. 1628), and during the sampling period from July, 1986, to March, 1988, averaged approximately 65 ppd (*see* Plaintiffs' Exhs. 6A, 7A; *see also* Item 208 (Tr.), p. 1627), of

toxic priority pollutants in an average 11.5 mgd flow. The City was not able to refute these figures; in fact, **Mr. Westendorf** (the City's Director of Water Facilities) confirmed these figures during his testimony. Item 195 (Tr.), pp. 256–57; Item 198 (Tr.), p. 480. Nonetheless, the City argues that the total pollutant loadings in the FST discharge, when added to loadings in the WWTP discharge, are essentially within the NPDES/SPDES permit limits and thus, since the harm to the environment is minimal, the FST discharge should be allowed to continue undiminished until repairs in the tunnel are made. The City further argues that the "volatilization" effect eliminates the majority of pollutant loadings from the FST flow after the point at which sampling is performed and before the discharge point. In light of the evidence before the court, I find these arguments by the City unpersuasive. With regard to volatilization, the testimony shows that only a limited number of samples were taken on two different occasions to measure the phenomenon's effect on pollutant loadings (Item 195 (Tr.), p. 170), the sampling and testing procedures were never submitted to or approved by the plaintiff regulatory agencies (*id.*, pp. 168–69), and there was no testing done to determine the effects of volatilization on air quality. *Id.* Accordingly, the evidence presented as to volatilization is of limited weight. Moreover, regardless of "combined" or "volatilized" flows, the FST discharge has been determined to be in and of itself a substantive violation of the Clean Water Act, enforcement of which does not depend on the quality of the receiving waters at any particular discharge point, or combination of discharge points. One of the fundamental purposes of Congress' enactment of the Clean Water Act "was to free EPA from the incubus 'of proving in every case the application of an effluent limitation at a specific site will improve water quality at that site.'" *Crown Simpson Pulp Co. v.*

*Costle*, 642 F.2d 323, 328 (9th Cir.1981) (quoting *Association of Pacific Fisheries v. EPA*, 615 F.2d 794, 807 n. 8 (9th Cir. 1980)). "Clearly, any argument that toxic discharges failed to make the receiving waters measurably worse frustrates the Act's intent to improve the quality of our nation's waters." *CP Chemicals*, 26 Env. Rep.Cases (BNA) at 2021. Thus, while the record is convincing that significant harm to the environment will indeed result should the court deny plaintiffs' request for injunctive relief in the instant case, such a showing is unnecessary where, as here, the statutory scheme provides for relief from a substantive violation without the need for an additional showing of harm. *See Top Notch*, 26 Env.Rep.Cases (BNA) at 2015–16 (continued violation of effluent levels constitutes irreparable harm); *see also Student Pub. Interest Research v. Georgia–Pacific*, 615 F.Supp. 1419, 1424 (D.N.J.1985) ("The Clean Water Act presumes unlawful discharges to reduce water quality because definite proof of the proposition is often nearly impossible."). Plaintiffs have therefore sufficiently demonstrated that the failure to issue an injunction requiring re-diversion of the FST flow to the WWTP would clearly cause continued harm to the environment and frustrate the underlying substantive purposes of the Clean Water Act.

The City and the ILC urge that the issuance of an injunction requiring re-diversion will cause severe hardship, outweighing plaintiffs' showing of hardship should the injunction not issue, not only to the users of the city sewer system in terms of higher sewer rates but also to the system itself in terms of engineering feasibility.[6] With regard to the alleged economic harm, defendants have presented evidence, basically uncontroverted by plaintiffs, to show that the annual cost of treating the entire 11.5 mgd FST flow, if re-diverted, would be somewhere between $1.4 and $1.6 million.

---

**6.** There is necessarily some degree of overlap with regard to evidence of "economic" and "engineering" harm. For example, the City has presented estimates of the projected cost of modifications to the pumping system which it has determined will be necessary in order to re-divert all or part of the FST flow. Such evidence, perhaps more properly characterized as "engineering costs," will be discussed later in this decision in the context of "engineering problems" as an element of harm separate and distinct from "economic harm."

Defendants' Exhs. S, T; Item 195 (Tr.), pp. 134–35; Item 204 (Tr.), pp. 1333–34. Such an increase, according to defendants, would have the effect of discouraging new industries from locating in the Niagara Falls area, and may cause industries already there to relocate. Plaintiffs argue that this increase in treatment costs would not impose an unreasonable economic burden on sewer users. Plaintiffs point to evidence and testimony showing that, after re-diversion, the residential user would be paying sewer rates amounting to approximately 1% of the median household income [MHI], well within the generally accepted affordable range of 1.5%–1.75%. Defendant's Exh. NN; Item 204 (Tr.), pp. 1339–42. The evidence further shows that re-diversion would cause an average rate increase of about 8.5% for SIUs and about 11% for CSIRUs. Defendants' Exhs. U, OO. Plaintiffs argue that these increases are not unreasonable in terms of average annual rate increases and, when compared to industrial sewer rates nationwide, do not reflect the magnitude of economic harm asserted by defendants.

I agree with plaintiffs' analysis of the evidence in this regard. For several reasons, the exhibits and testimony offered by defendants are inconclusive as to the extent of the economic impact of re-diversion. There is nothing in the record to show that the figures submitted comparing projected city sewer rates after re-diversion to residential and industrial rates nationwide are based on rates for sewer systems with comparable levels of wastewater treatment. Without such a foundation, it is impossible to determine the effect of variables such as industrial pretreatment costs for systems that do not provide adequate treatment of toxic chemicals, or state or local subsidization of sewer rates. Such variables could have a significant impact on a community's rate structure. Furthermore, several important considerations other than the cost of wastewater treatment factor into an industry's location or relocation decisions, including the cost of other utilities[7], labor resources, and transportation costs, and the City has produced no evidence to show that any industry would locate or relocate based solely on a projected 8.5% or 11% increase in sewer rates.

Accordingly, I find that defendants have not made a showing of economic hardship sufficient to require the denial of plaintiffs' request for injunctive relief. By enacting the Clean Water Act, Congress clearly struck the balance in favor of the environment notwithstanding the Act's economic impact on dischargers of pollutants. *See EPA v. National Crushed Stone Association*, 449 U.S. 64, 79, 101 S.Ct. 295, 305, 66 L.Ed.2d 268 (1980) (Congress foresaw economic hardship which effluent limitations would cause); *U.S. v. Ciampitti*, 583 F.Supp. 483, 499 (D.N.J.1984) (economic loss to defendant far outweighed by benefit to community from enjoining activities adversely affecting environment). There is nothing in the record to indicate that the balance should be struck differently here.

A closer question is presented with respect to whether re-diversion of all or part of the 11.5 mgd FST flow will result in engineering problems which might tip the balance of equities in favor of the City. The record indicates that the WWTP is now fully functional after extensive repairs, and is currently operating at approximately two-thirds capacity.[8] Item 195 (Tr.), pp. 218–21. It is essentially beyond dispute, and the evidence shows, that the WWTP could immediately treat the entire FST flow on a long-term basis and retain sufficient capacity to handle short-term wet weather (including "first flush") flows without significant engineering difficulties. *Id.*, pp. 230–31; Item 209 (Tr.), pp. 1826–27. The major engineering problem remaining, which the extensive hearing testimony and

---

**7.** It is undisputed that electric power rates in the Niagara Falls area are among the lowest in the nation, and that Lake Erie provides an inexpensive and unlimited supply of fresh water.

**8.** According to the City's expert, the WWTP was designed to handle an average long-term dry weather flow of 48 mgd, and is capable of treating 60–65 mgd for several hours during storm events. The current dry weather flow is approximately 32 mgd. Item 195 (Tr.), pp. 218–21.

exhibits have failed to resolve, is whether the GPS pumps and the City's gravity sewer system would be able to handle the strain of pumping an additional 11.5 mgd to the WWTP.

As stipulated to by the parties prior to the hearing, the GPS is capable of pumping, and the sewer system is capable of handling, a maximum of between 19.8 mgd and 20.6 mgd. Item 193, ¶ 21; Item 203 (Tr.), pp. 1065–66. The current flow into the GPS averages approximately 7 mgd. Item 193, ¶ 21. Thus, according to the plaintiffs, the City could take back the entire 11.5 mgd FST flow and, even when added to the current average flow of 7 mgd, the amount pumped from the GPS would still be well within the sewer system's maximum capacity of 20.6 mgd. Furthermore, plaintiffs point out that the GPS was in fact pumping the entire FST flow for several years prior to the implementation of the Conversion Project in May, 1985, without experiencing engineering problems of the magnitude envisioned by the City. Item 203 (Tr.), p. 1080; Item 213, p. 4.

Pursuant to this court's order dated March 10, 1988 (Item 155), the City conducted a detailed study of the GPS to establish the current capacity of the pumps and the sewer system under a variety of weather conditions, and to determine the extent of modifications necessary in order to ensure proper operation of the system should the FST flow be ordered re-diverted. *See* Defendants' Exh. CC. As a result of this study, the City has determined that in terms of engineering feasibility, total re-diversion would be an imprudent, and perhaps dangerous, course of action at this time. Item 202 (Tr.), pp. 1005–06. In order to pump an additional 11.5 mgd back through the sewer system to the WWTP, significant modifications to several components of the GPS would be necessary. Defendants' Exh. CC, Table 4. Certain modifications have already been made. Item 214, pp. 7–8. Even with implementation of the full range of proposed modifications,

however, the substantial question remains as to the capacity of the piping in the rest of the sewer system to safely handle an 11.5 mgd increase on a daily basis in all types of weather. Item 202 (Tr.), pp. 979–95; Item 203 (Tr.), pp. 1161–62. Furthermore, such modifications would not eliminate the problem of the decreased capacity of the system to capture "first flush" flows, which typically contain a higher concentration of pollutants than later storm flows, if the GPS were required to pump an additional 11.5 mgd. Item 208 (Tr.), pp. 1696–97. The evidence is convincing that these flows would essentially pass into the overflow weirs and thus be discharged, untreated, directly into the river, potentially negating a large measure of the benefits anticipated as a result of re-diversion. Item 194 (Tr.), pp. 118–20; Item 202 (Tr.), pp. 995–96; Item 203 (Tr.), pp. 1162–64. The City has also presented an outline and cost estimate of GPS modifications necessary to send 4 mgd to the WWTP. Defendant's Exh. CC, Table 2. Such modifications would approximate the same extent and cost as those required for an 11.5 mgd re-diversion.[9] However, re-diversion in the 4–5 mgd range would not present the same capacity problems for the rest of the sewer system as would total re-diversion. Item 202 (Tr.), pp. 1014–15, 1018–20. Additionally, by letter dated October 21, 1988 (Item 215), the City has indicated its commitment, regardless of the scope of the remedy ordered by the court, to continue its efforts to repair the FST at the PASNY crossing. The City has estimated that such repairs will eliminate up to 9 mgd of the total 11.5 mgd flow. If this should indeed be the result, there would no doubt be little argument that the remaining FST flow could be pumped to and treated at the WWTP without any engineering or economic difficulty whatsoever. The City, by that same letter, has also indicated its willingness and ability to immediately treat 4.5 mgd of the FST at the WWTP while the PASNY repairs are being carried out, and to continue indefi-

---

**9.** The GPS report estimates that total cost of modifications necessary for re-diversion of 11.5 mgd would be approximately $760,000 (Defendants' Exh. CC, Table 4), and the total cost of necessary modifications for 4 mgd would be approximately $725,000. *Id.,* Table 2.

nitely to treat the residual flow if the repairs do indeed reduce the dry weather flows to below 4.5 mgd. Item 215.

I believe these factors to be of significant weight in the court's equitable analysis. After hearing extensive testimony and argument and reviewing the volume of exhibits, memoranda of fact and law, and other submissions on file, I am convinced that injunctive relief is appropriate in this case, but am not convinced that the scope of that relief should be defined by full re-diversion. I recognize that the weight of the evidence strongly suggests that the major components of the sewer system, including the WWTP and the GPS, are currently capable of handling the entire FST flow. However, several other factors, including *inter alia* the age of the GPS pumps and the capacity of the gravity and pressure sewer systems during first flush storm flow periods, cannot be ignored by the court in its equitable analysis. Accordingly, I find that the most prudent exercise of discretion under all of the circumstances presented would be to grant plaintiffs' request for a permanent injunction ordering immediate re-diversion of the maximum portion of the FST flow that can now be accomplished without further significant modifications to the GPS, to the WWTP, or to the remainder of the sewer system of the City of Niagara Falls. Unless as a result of natural conditions, at no time shall that re-diverted flow be less than 4.5 mgd. The City shall continue to implement its plan to repair the FST, and shall adhere to any schedule agreed upon or ordered by the court. Should those repairs reduce the FST flow to below 4.5 mgd, the City shall treat that residue at the WWTP indefinitely, or until further relief is ordered.

The parties shall meet with the court on March 9, 1989, at 2 p.m. to discuss a schedule for the implementation of this order.

So ordered.